[No. G018273. Fourth Dist., Div. Three. Oct. 29, 1997.]

In re Marriage of the TAMMY LYNN and KEITH COLLINS PERRY.
TAMMY LYNN PERRY, Respondent, v.
BEVERLY PERRY, Appellant.

COUNSEL

Mathews & Kluck, Francis B. Mathews and Kelly M. Walsh for Appellant.

Richard M. Hawkins for Respondent.

OPINION

SILLS, P. J.—

INTRODUCTION

█ It is well established that a child support obligation survives the death of the supporting parent and is a charge against his or her estate. (*Taylor* v. *George* (1949) 34 Cal.2d 552, 556 [212 P.2d 505] ["In California the rule is that the obligation of a father to support his minor child which is fixed by divorce decree . . . does not cease upon the father's death, but survives as a charge against his estate."]; *In re Marriage of Bertrand* (1995) 33 Cal.App.4th 437, 440 [39 Cal.Rptr.2d 151] ["Although husband has since died, his support obligation survives his death and is a charge against his estate . . . ."]; *In re Marriage of Gregory* (1991) 230 Cal.App.3d 112, 115 [281 Cal.Rptr. 188] [". . . it has been established that court ordered child support survives the death of the noncustodial parent and becomes a charge upon his or her estate"].)

But what happens when the supporting parent's property is put into a "living trust" so that there is, technically speaking, no probate estate to come into existence upon the supporting parent's death? The family law judge in the present case was not fooled by the living trust device, and made an order against the trustee, requiring child support payments to be made from the trust property. Moreover, his order required that the payments be made from such amounts of the trust as would otherwise be immediately distributed to the deceased supporting parent's own parents and siblings. We affirm because, for purposes of the surviving child support obligation, there is no difference *in substance* between an estate which might be properly charged with the child support obligation and property held by a living trust.

## FACTS

The facts are simple and undisputed. Tammy Lynn Perry and Keith Collins Perry had a daughter, Tamitha, in 1983. Keith was badly injured in an auto accident in 1987 and obtained a structured settlement from the manufacturer of the automobile involved. The structured settlement entitled Keith to an income stream consisting of payments of around $5,000 to $6,000 a month, plus larger, periodic, lump sum payments at less frequent intervals.

In 1989 the marriage was dissolved, and an order made requiring Keith to pay $350 a month in child support. In June 1991 Keith transferred all his rights in the structured settlement to a living trust controlled by his mother, Beverly Perry, as trustee, under the terms of which half was to be distributed outright to any surviving parents, a fifth was to be distributed to his brothers and sisters, and the remaining 30 percent was to remain in the trust and be distributed to his daughter, Tamitha, when she turns *40*.

Keith died in 1992. Tamitha was now eligible for payments of $434 a month under Social Security survivors' benefits, so in February 1992 Beverly unilaterally discontinued making child support payments. In late 1994 Tammy filed an order to show cause proceeding in the dissolution action to modify the child support order upward, and for an order that one-half of the structured settlement money be awarded to her as a missed asset. The child support increase request was in part based on the money freed up because (needless to say) Keith no longer needed it for personal and medical expenses.

Beverly was joined to the family law proceeding. In May 1995 the family law judge handed down a tentative decision in which he ruled that the "estate of the father"—which he specifically identified as "The Trust"—owed back child support of $350 from February 1992 to December 1994 ($16,170 with interest). He also increased child support as of January 1995 to $800 per month. The judge specifically took Tamitha's $434 payment into account in making the increase order. (The arrearage on the additional payments was $2,250.) The order was finalized in June 1995. In its last paragraph it required Beverly, as trustee, to make the required payments out of the funds held by the trust, as distinct from any funds being held by Beverly "as trustee for Tamitha." In essence, the child support payments were to be made "off the top" of the trust income as it came in. Also, the "missed asset" request was denied.

The next month Beverly brought a motion for a new trial, arguing that it was "an impossibility" for her to pay the support out of the trust fund but not

out of the 30 percent held in trust for Tamitha, because the 30 percent "was all that remains" of the trust. That motion was denied and Beverly's notice of appeal soon followed. Tammy filed a cross-appeal from the order denying her request for half the settlement proceeds as a missed asset.

DISCUSSION

*A Supporting Parent's "Estate" for Purposes of a Child Support Order Includes Property Put Into a Living Trust*

Living trusts are popular estate planning devices. (See generally, *Fisch, Spiegler, Ginsburg & Ladner* v. *Appel* (1992) 10 Cal.App.4th 1810, 1813 [13 Cal.Rptr.2d 471] for a discussion of their uses, including, of course, avoidance of probate.) Technically speaking, they are not "estates" in themselves, but devices to *manage* an "estate." (For examples of such a use, see *Estate of MacDonald* (1990) 51 Cal.3d 262, 276 [272 Cal.Rptr. 153, 794 P.2d 911], and *Estate of Steele* (1980) 113 Cal.App.3d 106, 111 [169 Cal.Rptr. 635].)

In *Belshé* v. *Hope* (1995) 33 Cal.App.4th 161 [38 Cal.Rptr.2d 917], a panel of the Fifth District Court of Appeal had occasion to meditate on the meaning of "estate" in a context only superficially dissimilar from the one before us. In *Belshé*, the Department of Health Services sought reimbursement for Medi-Cal payments made to a trustor who—like Keith—had put property into a living trust. Upon the trustor's death the "trust estate" was to be delivered to her husband or, if he predeceased her, to her four children. After the trustor's death, the department sued the children under a federal statute which, at the time, did not define "estate." The children argued, much as Beverly argues here, that the real property was not "within the estate" of the decedent when she died and therefore was exempt from any claim by the department. (See *id.* at p. 164.)

The *Belshé* court rejected the children's "no estate" argument. The court noted that "[t]he word 'estate' is ambiguous and could mean probate estate or taxable estate." (33 Cal.App.4th at p. 173.) Significantly, the term can be broader than "just the portion of the estate which passes by will or intestacy." (*Ibid.*) Giving the word a broad meaning in the context of the state's reimbursement action effectuated the *purpose* of the federal reimbursement statutes. Any other interpretation of "estate" would have made the state's right to reimbursement depend on "technical differences in the character of how property is owned." (*Id.* at p. 174.)

If the word estate is to be given a broad meaning to implement the purposes of a Medicaid reimbursement statute, it should likewise be given

such a meaning where child support is involved. Like the court in *Belshé*, we cannot countenance allowing the technical difference between a living trust and a will to protect property otherwise subject to a support obligation. To do so would be to allow Keith's heirs—and we do *not* use the word "heirs" in its technical sense, but in its basic sense of those people on whom Keith would naturally want to bestow *his* property—to reap a windfall. Indeed, there is even *more* reason here than in *Belshé*, because the present case involves an equitable proceeding arising in the family law court, while the *Belshé* case involved a claim at law.[1]

After all, if a will cannot insulate property from child support claims, a living trust should not either. The rule cannot be in California that if you make a will your property will be subject to an existing child support order but if you put everything in a living trust your property will be immune. That would be, to paraphrase a famous aphorism, the estate planning equivalent of a free lunch.

If there remains any doubt as a matter of family law, the clincher is to be found under the law governing living trusts themselves. Probate Code section 19001, subdivision (a) (which uses the word "settlor" instead of "trustor"[2]) provides: "Upon the death of a settlor, the property of the deceased settlor that was subject to the power of revocation at the time of the settlor's death is subject to the claims of creditors of the deceased settlor's estate . . . to the extent that the deceased settlor's estate is inadequate to satisfy those claims and expenses." In the context of an existing child support order the statute is a clear statement of legislative intent that property put into a living trust (i.e., subject to the trustor's power of revocation) must be *available* to satisfy a valid child support obligation, no matter what the trust's terms of distribution. Accordingly, Beverly's argument that there is no "estate" left to pay Keith's child support obligation must fail.

---

[1]Because the property of the trust is the right to receive monthly and periodic payments we are, serendipitously, spared the need to comment on the practical problem of recovering or otherwise seeking reimbursement for money already distributed by the trust. In this case it isn't as if there was a bank account the proceeds of which were disbursed on the death of the trustor. Here, there is a steady stream of payments, and there is more than enough to meet the child support obligation even when those payments are paid first from the trust's income as it comes in. When Beverly argues that everything in the trust (except the 30 percent to go to Tamitha anyway) has already been "distributed" and "nothing remains," she is relying on an unspoken assumption which we do not accept—namely, that the trust terms were legally effective in removing 70 percent of the payments coming in from the reach of a child support order. Her argument is essentially a tautology: "The Trust has no money to pay child support because the terms of the Trust say it has no money to pay child support."

[2]Black's Law Dictionary defines "Trustor" as "One who creates a trust. Also called settlor." (Black's Law Dict. (5th ed. 1979) p. 1358, col. 1.)

It is important to note that this is not a case where the deceased supporting parent established a fund or made some other provision in his or her lifetime for the payment of an existing child support order. (Cf. *Taylor v. George*, *supra*, 34 Cal.2d at pp. 555, 558 [supporting parent had life insurance policies worth $6,176 on which child was named beneficiary; these policies were more than sufficient to meet future support payments totaling $5,500, therefore ex-spouse could not properly bring claim against estate for that amount].) The 30 percent of the living trust property which Keith ostensibly reserved for Tamitha is, by the terms of the trust, beyond her reach until she is 40 years old, so it was obviously not intended to meet his *existing* child support obligation. Indeed, the terms of the trust indicate an intention to avoid any child support obligation whatsoever. Accordingly, the family law court could properly make a child support order payable from the whole of the trust property, not just the 30 percent which was earmarked to go to Tamitha eventually.

One more aspect of the case must be noted, if only to make clear that we do not decide it, and that is the problem of the postdeath *increase* in the child support order *qua* increase. Perhaps because she has focused on the operation of the living trust (which ostensibly put 70 percent of Keith's property into the hands of his parents and siblings) Beverly has not argued in this appeal that the family law court should not have made an upward modification of an existing child support order after Keith's death. What she has argued is that *any* support order could not reach the 70 percent of the trust property to be distributed to the parents and siblings. The question of whether postdeath upward modifications of existing child support orders are ever permissible is a question which can be left for another day, when it is properly raised in the briefs. Our opinion is limited only to situations where the deceased supporting parent has attempted to put his or her property beyond the reach of an existing child support obligation through the device of a living trust, and only then to the question of whether the property in that trust, including amounts ostensibly to be distributed to third parties, is available to satisfy a child support order. (Answer: yes.) For purposes of what we need to decide to resolve this appeal, it makes no difference whether we are dealing with an existing child support order or an increased one.

Needless to say, to allow a postdeath *increase* in an existing child support order on the theory that the death frees up money otherwise needed by the decedent would severely destabilize estate planning. (See *Taylor v. George*, *supra*, 34 Cal.2d at p. 558 [because decedent's life insurance covered total amount of support payments, *additional* claim could not be made against estate].) The circumstances of exactly when such an increase *might* be allowed, if *ever*, are not before us.

*A Family Court Has Jurisdiction to Make an Order Against the Trustee of a Living Trust Established by a Deceased Supporting Parent*

The next question is whether the claim against the trust was properly within the subject matter jurisdiction of the family law court, as distinct from the probate court. (See generally, *Saks* v. *Damon Raike & Co.* (1992) 7 Cal.App.4th 419, 423, 432 [8 Cal.Rptr.2d 869] [claims that trust assets were looted by trust attorney and real estate broker should have been exclusively litigated in probate department of superior court].) Our concern with this point prompted us to ask for supplemental briefing.

We are satisfied that the family law court was a correct forum. The subject matter jurisdiction of the probate court is set forth in Probate Code section 17000. The statute gives the probate court exclusive jurisdiction over the "internal affairs of trusts" (see Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (1991 ed.) § 17000, p. 182) but only gives it *concurrent* jurisdiction over "proceedings" by "creditors . . . of trusts." (See Prob. Code, § 17000, subd. (b)(2).)

The child support modification proceeding in the family law case here is—in substance—a proceeding by a creditor of the trust, not a proceeding confined to the trust's internal affairs. Tammy's claim involves what the trust owes a third party, *independent* of the trust's internal terms of distribution. The family court thus had the jurisdictional authority to join Beverly to a dissolution proceeding and order payments from the trust corpus.

*There Was No Need to Join the Beneficiaries of the Trust*

Beverly further claims that Tammy failed to join certain supposedly indispensable parties to the family law proceeding, namely Keith's father, Keith's brothers and sisters, and Beverly in her individual capacity. These persons were indispensable parties, she reasons, because their interests are affected by the family law decree.

Beverly forgets that it is the *trust* to which Keith assigned his rights under the structured settlement. It is the trust which takes in each payment under that settlement. Tammy's claim is as a creditor of the trust, not against Keith's relatives individually. There was no more need to join those relatives here than there would be a need to join the stockholders of General Motors to a lawsuit against it based on money it owed to unpaid vendors. The relatives' interests are affected only indirectly.

*Half of the Structured Settlement Did Not Constitute a "Missed Asset"*

The final issue arises out of Tammy's cross-appeal, in which she contends that the family court erred in not treating half the annuity payments otherwise going to the trust as a "missed asset" from the 1989 dissolution. (Cf.

*Henn* v. *Henn* (1980) 26 Cal.3d 323, 332 [161 Cal.Rptr. 502, 605 P.2d 10] [discussing assets left unadjudicated in family law proceeding].) In particular she contends that Keith would have wanted her to receive half the structured settlement upon his death, as reflected in written agreements between them made *during* their marriage.

Tammy's contention is meritless. As Tammy acknowledges, the family law judge in the original dissolution proceeding assigned *all* the payments to Keith because of his need. Whatever else it was, the "asset" represented by the entirety of the structured settlement payments was obviously not missed. ■ Tammy forgets that California law has directed family law judges to award all money received in satisfaction of a personal injury judgment to the spouse who suffered the injury *unless* "taking into account the economic condition and needs of each party" the "interests of justice" require another disposition. (See current Fam. Code, § 2603; former Civ. Code, § 4800, subd. (b)(4).) The time to argue that the interests of justice (encompassing, for example, any written agreement during the marriage or rights of survivorship set forth in the structured settlement itself) required something *other* than an award of all the personal injury settlement to Keith was in the dissolution, not in a postjudgment modification proceeding.[3] Any other result would turn the family law court into a probate court by allowing the reopening of property awards upon the death of an ex-spouse so as to give intent to his or her wishes.

## DISPOSITION

The family court's orders are affirmed. Because each side has prevailed on at least one issue, in the interests of justice the parties will bear their costs on appeal.

Crosby, J., and Rylaarsdam, J., concurred.

---

[3]Keith was severely burned and eventually died at the age of 31. From what we are able to tell, any attempt on Tammy's part to argue that she should get any share of the settlement would have been doomed. Keith's death, of course, was not an occasion to relitigate the award.